IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LEROY EDWARDS,

     Plaintiff,

v.

PUBLIX SUPERMARKETS, INC.,

     Defendant.

CIVIL ACTION NO.
1:19-cv-00339-MLB-RDC

**CORRECTED ORDER AND
FINAL REPORT AND RECOMMENDATION[1]**

Plaintiff Leroy Edwards filed suit against his former employer, Defendant Publix Supermarket, Inc. ("Publix"), raising a claim of discrimination based on his African-American race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended 42 U.S.C. §§ 2000e-2a, 2000e-3(a).[2] Currently pending before the Court are Defendant's Motion for Summary Judgment (Doc. 45) and

---

[1] The undersigned previously entered an Order and Final Report and Recommendation (Doc. 80). This version merely corrects scrivener's errors and makes no substantive changes.

[2] Through his Amended Complaint, Plaintiff dismissed Count II of the Complaint, which raised a claim under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.*, and deleted references to alleged violations of the Equal Protection Clause and the First Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. *See* (Doc. 15).

Defendant's Motion to Strike (Doc. 61). For the reasons set forth below, Defendant's Motion to Strike (Doc. 61) is **GRANTED IN PART** and **DENIED IN PART** pursuant to 28 U.S.C. § 636(b)(1)(A), and the undersigned **RECOMMENDS**, pursuant to 28 U.S.C. § 636(b)(1)(B), that the Court **GRANT** Defendant's Motion for Summary Judgment (Doc. 45).

## I. BACKGROUND

As required when considering a motion for summary judgment, the Court has viewed the evidence and reasonable factual inferences in the light most favorable to Plaintiff, the non-moving party. *See United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). To the extent that material facts are in dispute, the Court has resolved the disputes in Plaintiff's favor.[3] *See Vaughn v. Cox*, 343 F.3d 1323, 1326 n.1 (11th Cir. 2003). The facts of the case, for the purpose

---

[3] The Court notes that for the purposes of resolving a motion for summary judgment, "facts" may not be considered unless they are unopposed or supported by citations to admissible evidence. *See* Fed. R. Civ. P. 56(c); LR 56.1(B), NDGa. For this reason, when the opposing party has pointed out that the evidence cited to support a factual statement is unsupportive, the Court has edited the fact to recite only the portion supported by the evidence; in cases in which the citation is absent or unsupportive, the Court has omitted the statement of fact entirely.

of adjudicating the motion for summary judgment presently before the Court, are as follows.

## A.    Procedural History

On October 9, 2018, Plaintiff filed a charge of discrimination against his former employer, Publix Supermarkets, Inc., with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff alleged that he was unlawfully terminated when his supervisor determined that he refused to comply with Publix's run-assignment policy. (Doc. 1). In the particulars of his claim, Mr. Edwards stated:

> I. I was hired by the above referenced employer on June 5, 1991, and last worked as a Truck Driver. Since 2016 I have been allowed to refuse a route that included driving in an area where I was involved in a serious accident in 2015. On May 8, 2018, the dispatcher gave me a route that included route 400. I reminded the dispatcher that I am allowed to not to [sic] make runs involving 400. The matter was taken up with Leonard Harris, Supervisor, who approved me taking an alternate route. On May 9, 2018, I was discharged.
>
> II. Charles Williams, Superintendent, said that I was being discharged for insubordination for having refused a route.
>
> III. I believe that I have been discriminated against because of my race (African-American), in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 45-3 at 130).

Following an investigation by the EEOC, the agency found dismissal of Mr. Edwards's claim was appropriate. (Doc. 45-3 at 131). An EEOC investigator

concluded the allegation could not be substantiated because Mr. Edwards admitted that "other African-American drivers with similar seniority have refused to take routes and have not been discharged. This makes your assertion that you were discharged for being African-American unlikely." *Id.* at 133. Mr. Edwards was advised of his right to sue within ninety days of receipt of the EEOC's notification of its decision to dismiss his claim. *Id.* at 285.

On January 18, 2019, Mr. Edwards filed this lawsuit against Defendant asserting violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000-2000e-17; the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101–12117; the Equal Protection Clause and the First Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. (Doc. 1). Plaintiff subsequently amended this complaint by dismissing every claim except the one alleging unlawful termination based on race discrimination. (Doc. 15). Following extended discovery, Defendant filed the Motion for Summary Judgment that is presently pending before this Court. (Doc. 45). With briefing complete, the undersigned now submits this Report and Recommendation for the District Judge's consideration.

## B.    Facts

By all accounts, Plaintiff Leroy Edwards was a dedicated and dependable employee of Publix Supermarkets, Inc., for nearly thirty years. (Pl.'s Stmt. of Mat.

Facts ("PSMF"), Doc. 57-2 at ¶ 3). Having secured a job with the Defendant as a teenager, he worked in various capacities until he began driving tractor-trailers in the company's transportation department. (Edwards Dep., Doc. 64 at 16–17). Plaintiff had a reputation as friendly, easy-going, and eager to accept any driving assignments he received. (PSMF ¶¶ 2, 3; Porter Dep., Doc. 66 at 43; Porter Aff., Doc. 57-3 at 2). He has been described as having had "a good driving record, good customer service at the stores, good personality with others." (Williams Dep., Doc. 55 at 24).

On September 25, 2015, Mr. Edwards was involved in a serious work-related accident. (Def's Stmt. of Mat. Facts ("DSMF"), Doc. 45-2 at ¶ 2; Doc. 57-3 at 1–2). He was driving his tracker-trailer on Georgia State Route 400 in Atlanta when a passenger vehicle clipped his driver's side tire. (Edwards Dep., Doc. 64 at 18; Williams Dep., Doc. 55 at 24–25; Doc. 45 at 5). This collision caused Mr. Edwards to lose control of his rig as it struck the side of the guardrail. (Edward Dep., Doc. 64 at 18–19). Despite his efforts, Mr. Edwards could not control the trajectory of the tracker-trailer. *Id.* His vehicle breeched the railing and onto the interstate below. (*Id.*; Doc. 45 at 5–6). An oil tanker attempting to avoid the collision tipped over and careened down the side of the embankment. (Edwards Dep., Doc. 64 at 19–20). As a result of this devastating crash, Mr. Edwards suffered serious injuries to his hips,

ankles and shoulder. (PSMF, Doc. 57-2 at ¶ 4). He continues to experience pain in his hip and suffers from Post-traumatic Stress Disorder. *Id.*

After recuperating for several months, Mr. Edwards returned to work in 2016. (DSMF, Doc. 45-2 at ¶ 5). In order to allow him to "ease his way back into [driving]," he was allowed to ride with other drivers. (Williams Dep., Doc. 55 at 26). In the years preceding Mr. Edwards's accident, Publix implemented a run-assignment protocol to allow for the efficient transportation of its products from its distribution centers to its stores. (Doc. 45 at 3–4). This system assigned delivery runs to its truck drivers throughout the day. *Id.* When drivers reported for the "first runs" of their respective shifts, they were assigned specific runs based on a particular time, assigned through a seniority-based bidding process. (Wallace Dep., Doc. 56 at 17–19; Horn Dep., Doc. 50 at 15–16). For his first run, a driver checked with a dispatcher at the dispatch window who provided several possible runs equal to the number of drivers present at a particular start time. (Horn Dep., Doc. 50 at 15–19; Wallace Dep., Doc. 56 at 16–22). The runs were scheduled based on their expected delivery times and to ensure the inventory requests of each store were properly fulfilled. (Doc. 45 a 3–4). The drivers were allowed to select from the first runs of the day in order of their seniority. (Edwards Dep., Doc. 64 at 61; Williams Dep., Doc. 55 at 36–43; Wallace Dep., Doc. 56 at 17–19). Once a driver received his assignment, he was allowed to choose his own route of travel to complete a run. (PSMT, Doc. 57-2 at ¶

9). However, a supervisor or "lead" could suggest a preferred route to complete the run. When a driver finished his first run of the day, he would return to the dispatch window and would choose his subsequent delivery runs to be performed that day. If more than one driver was present, the most senior driver would be allowed to choose from the available runs. (Harris Dep., Doc. 54 at 22–25; Wallace Dep., Doc. 56 at 51).

Publix modified this policy in early 2018. (DSMF, Doc. 45-2 at ¶ 11; Doc. 45 at 3–4). This revised policy disregarded driver seniority in the assignment of second (and subsequent) runs in a given day. (DSMF, Doc. 45-2 at ¶ 12; Williams Dep., Doc. 55 at 42–44). Because drivers' runs tend to vary in length, they may return at different times. As a result, drivers would have varying amounts of remaining driving hours. (Williams Dep., Doc. 55 at 37–38). A dispatcher assigning a driver's second run would have to consider the particular inventory requests of its stores, the number of deliveries the distribution center needed to complete, and how many driving hours a driver had remaining in his DOT-allowed time.[4] *Id.* at 37–39; (Harris Dep., Doc. 54 at 23–25, 28–30). Unlike for their first runs, the new policy did

---

[4] The Department of Transportation ("DOT") sets the maximum number of hours a driver is allowed to drive each day. *See* 49 C.F.R. §§ 395.3; 395.3(a); Doc. 45 at 3. Publix utilizes a computerized management program to log a driver's daily mileage in order to accurately record her travel in compliance with DOT regulations. (Harris Dep., Doc. 54 at 30–32).

not permit drivers to choose their second and subsequent runs. (DSMF, Doc. 45-2 at ¶¶ 12, 13; Williams Dep., Doc. 55 at 45–48). Instead, drivers were required to accept the next available run and were not permitted to refuse an assigned second run. (Horn Dep., Doc. 50 at 17–18; Williams Dep., Doc. 55 at 31–32; 36–39).

In March 2018, Publix posted a notice describing this new policy near the dispatch window. (DSMF, Doc. 45-2 at ¶ 17; Williams Dep., Doc. 55 at 45–46). Charles Williams, a superintendent in the Dispatch Department at the Atlanta distribution center, posted the notice to avoid any "misconceptions from both drivers and even those in the office about what is exactly supposed to happen" and to ensure that "everybody gets treated fairly and that everybody gets treated the same way." (Williams Dep., Doc. 55 at 36–37; 43–45). The notice stated that, for first runs, drivers "will have a choice of runs based on the number of drivers coming in at [a driver's] start time." (Doc. 54-1 at 1). However, for second and subsequent runs, the assigned runs were only to be based on a driver's remaining hours, Publix's remaining workload, and the next-most-likely on-time run. *Id*. Mr. Edwards admitted that this notice was posted and that he read it and understood it. (Doc. 60; Publix's Req. for Admis. Nos. 7–11).[5]

---

[5] Although Plaintiff testified that he had not received notification of the modification of the run-assignment policy and did not see it posted near the dispatch window, he failed to respond to Defendant's Requests for Admissions. (Doc. 45-1). If a party fails to answer questions for admission, the facts in those requests are to

In April 2018, Mr. Edwards appeared at the dispatch window to receive his second run of the day. He was assigned a run that could have taken him near the site of his prior accident. (Edwards Dep., Doc. 64 at 47–48; Harris Dep., Doc. 54 at 54–55). Mr. Edwards told the dispatcher that he did not "go that way," later informing his supervisor, Leonard Harris, that he did not want to take the run because it was near the location of his 2015 accident. (Edwards Dep., Doc. 64 at 47; Harris Dep., Doc. 54 at 55). Mr. Harris did not require that Mr. Edwards take the assigned run, instead assigning a different run. (Harris Dep., Doc. 54 at 56; Edwards Dep., Doc. 64 at 47). Mr. Harris then emailed Shannon Horn, the department head at that time, seeking advice on what to do if this scenario came up again. (Williams Dep., Doc. 55 at 28; Harris Dep., Doc. 54 at 56–58; Horn. Dep., Doc. 50 at 21). Mr. Horn told Mr. Harris that Publix needed to consistently enforce its run-assignment policies: "when [drivers] first come in, they get the first choice," but "the second time when they come is whenever they get what needed to go at that time." (Horn Dep., Doc. 50 at 21).

The incident in April 2018 was the first Mr. Edwards's supervisors had heard of any issues with Mr. Edwards driving near the scene of his accident. (Williams Dep., Doc. 55 at 27–28, 31, 35; Horn Dep., Doc. 55 at 22–23; Harris Dep., Doc.

---

be deemed admitted; they will be considered "conclusively established." Fed. R. Civ. P. 36(a), (b). Thus, this Court finds that the Defendant's requests for admission Nos. 7–11 are deemed **ADMITTED**. (Doc. 60 at 5–7).

54 at 59–60). Plaintiff had made deliveries to stores within a few miles of the accident site in the previous few months. (Williams Dep., Doc. 55 at 77–78; Bullard Dep., Doc. 53 at 42–42). These stores were located in Brookhaven, not far from the store associated with the run Mr. Edwards refused to take. (Bullard Dep., Doc. 53 at 42). Mr. Horn later spoke to Mr. Edwards about the incident, reminding him of the need to follow Publix's process for taking the next-most-likely, on-time delivery. (Williams Dep., Doc. 50 at 30–31; Horn Dep., Doc. 50 at 25; Edwards Dep., Doc. 54 at 48). Mr. Horn emphasized the need to remain consistent and reminded Mr. Edwards that he was able to take alternative *routes* to complete a run. (Horn Dep., Doc. 54 at 28). Mr. Horn then discussed the matter with Mr. Williams. *Id*. at 27. Mr. Williams believed that, after Mr. Horn's conversation, "everybody was on the same page" and Mr. Edwards "understood [Publix's] process." (Williams Dep., Doc. 55 at 31, 72).

On May 8, 2018, Mr. Edwards again refused to accept an assigned second run to a store that might take him near the site of his accident. (Williams Dep., Doc. 55 at 48–49; DSMF, Doc. 45-2 at ¶ 25). Mr. Edwards told David Bullard, a lead person in Dispatch, that he did not want to take the run because "he did not feel comfortable" taking it. (Bullard Dep., Doc. 53 at 32; Edwards Dep., Doc. 64 at 32–33). Mr. Bullard did not consider that statement, on its own, to be a refusal. (Bullard Dep., Doc. 53 at 32–33). Instead, he hoped that he would be able to convince Mr. Edwards to drive

the recommended route. (Bullard Dep., Doc. 53 at 33). Mr. Bullard then called Mr. Williams and told him about the situation. Mr. Edwards and Mr. Bullard talked with Mr. Williams over the phone. *Id*. Mr. Williams told Mr. Edwards that he had to take the assigned run; Publix's policy regarding second runs could not allow Edwards to "skip over a run and give [Edwards] something [he] want[ed]." (Bullard Dep., Doc. 53 at 36). When Mr. Williams learned that Mr. Edwards did not want to go near the accident site, he and Mr. Bullard presented Mr. Edwards with "several different options to take him around the accident scene so that he wouldn't even have to see it, get him as far away from it as possible and still be able to complete the trip." (Williams Dep., Doc. 55 at 33; 60–61; Bullard Dep., Doc. 53 at 39; Edwards Dep., Doc. 64 at 90). Mr. Edwards suggested doing a different run to downtown Atlanta, but Mr. Williams could not accept this compromise. (Williams Dep., Doc. 55 at 60; Edwards Dep., Doc. 64 at 92–95).

In Mr. Williams's opinion, the company's protocol should be consistently applied; he could not allow drivers to avoid certain areas. (Williams Dep., Doc. 5 at 64). Mr. Williams's goal was "to get [Mr. Edwards] through that one experience so that we could come back and talk about it later." *Id*. at 59. Mr. Williams and Mr. Bullard talked with Mr. Edwards for half an hour trying to convince him to drive the route they recommended. (Edwards Dep., Doc. 64 at 94). Mr. Edwards actively participated in the discussion, and it appeared he would accept Mr. Bullard's

suggestions. (Williams Dep., Doc. 55 at 62; Bullard Dep., Doc. 53 at 41). However, even though Mr. Williams believed they had agreed to an alternative route, he testified that Mr. Edwards "ultimately said, no, I'm not going to do it." (Williams Dep., Doc. 55 at 63). Mr. Williams viewed this impasse as Mr. Edwards's refusal to take the run and warned him that he would face discharge. (Williams Dep., Doc. 55 at 63; Bullard Dep., Doc. 53 at 42; Edwards Dep., Doc. 64 at 99). He explained that "Even when presented with multiple options, [Mr. Edwards] refused all options that were given to him to complete that trip." (Williams Dep., Doc. 55 at 79).

The next day, Mr. Edwards was terminated. According to Mr. Williams, he was fired because he refused to accept an assigned run. (Williams Dep., Doc. 55 at 55–59, 94; Harris Dep., Doc. 54 at 69; Edwards Dep., Doc. 64 at 116–17). Publix publishes Rules of Unacceptable Conduct that prohibit, *inter alia*, "refusal or reluctance to comply with the instructions of a person in charge." (Doc 45-6 at 52–57). Violation of Publix's rules can lead to discharge, and based on the circumstances, "Publix may discharge associates without prior coaching, counseling or warnings." (*Id.*; Williams Dep., Doc. 55 at 15). Refusal to perform an assigned task—like refusing an assigned delivery run—is grounds for termination. (Wallace Dep., Doc. 53 at 81; Horn Dep., Doc. 50 at 42).

On October 9, 2018, Mr. Edwards filed a charge of discrimination with the EEOC. (Edwards Dep., Doc. 64 at 131, 141). On October 23, 2018, the EEOC

informed Edwards that it was unable to conclude that the information it gathered supported a violation of Title VII. (Doc. 45-3 at 131). An EEOC investigator noted that Mr. Edwards "maintained that other African-American drivers with similar seniority have refused to take routes and have not been discharged. This makes your assertion that you were discharged for being African-American unlikely." *Id.* at 13. Following the dismissal of his claim, Mr. Edwards brought this action. In his complaint, he alleged that he was terminated "for requesting alternate routes while [Defendant] allow[ed] similarly situated white drivers to select alternate routes based upon seniority, preference and availability." (Doc. 1 at 9).

## II. MOTION TO STRIKE

Defendant requests that the Court "strike or deem admitted certain responses" from Plaintiff's Response to Movant's Statement of Material Facts in Support of Summary Judgment. (Doc. 61 at 1). In support of this motion, Defendant avers that Plaintiff's responses "either deny certain facts asserted by Publix, only to then prove the facts true with Edwards's explanation, or state facts that are not responsive to the paragraph to which Edwards is responding." *Id.* Defendant asks this Court to deem admitted the facts Plaintiff wrongfully denies or denies based on non-responsive facts and strike his factual assertions as non-responsive. In response, Plaintiff admits the facts submitted in Paragraphs 8, 9, 39, 40 and 45. (Doc. 71 at 2, 3, and 80). Based on these concessions, this Court will deem Movant's Statement of Material Facts as

to those paragraphs **ADMITTED** and the Defendant's motion is **GRANTED** in this respect.

As to the remaining responses provided in paragraphs 2, 3, 6, 7, 13, 14, 16, 17, 18, 19, 20, 25, 26, 27, 30, 33, 36, and 45, Defendant's motion to strike is **DENIED**. Motions to strike are governed by Rule 12(f) of the Federal Rules of Civil Procedure, which provides that a court may order stricken from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ P. 12(f). Pleadings include complaints, answers, replies to counterclaims, answers to cross claims, third-party complaints, and third-party answers, and not statements of material fact. Fed. R.Civ. P. 7(a). Thus, a motion to strike a statement of material fact filed in support of a motion is inappropriate and should be denied. *Cheavez v. Credit Nation Auto Sales, Inc*., 966 F. Supp. 2d 1335, 1355 (N.D. Ga. 2013) ("The Court has repeatedly explained that a motion to strike is not the proper vehicle for challenging matters not contained in pleadings."); *see also*, *Jordon v. Cobb Cnty., Ga.*, 227 F. Supp. 2d 1322, 1346 (N.D. Ga. 2001) ("The proper method for challenging the admissibility of evidence . . . is to file a notice of objection to the challenged testimony, not a motion to strike."). Accordingly, Defendant's Motion to Strike (Doc. 61) is **GRANTED in part** and **DENIED in part**. The Court will consider ADMITTED the Movant's Statements of Material Fact presented in paragraphs 8, 9, 39, 40, and 45.

## III. MOTION FOR SUMMARY JUDGMENT

### A.      Summary Judgment Standard

Rule 56 of the Federal Rule of Civil Procedure provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). The responsibility includes identifying each claim for which summary judgment is sought and the evidence that it believes demonstrates the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 323; *Gentry v. Harborage Cottages-Stuart, LLLP*, 654 F.3d 1247, 1261 (11th Cir. 2011).

When a party moves for summary judgment on all claims, the nonmovant must respond by, at the very least, raising any and all arguments or defenses that precludes judgment for the moving party. *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009). "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.

15

1995). Failure to respond to arguments seeking summary judgment for a claim constitutes an abandonment of the issue and warrants entry of summary judgment on that claim. *Cockrell v. Baruah*, No 1:06-cv-600-ECS, 2008 WL 11333465, at *6 (N.D. Ga. Dec. 22, 2008) (citing *Otu v. Papa John's USA, Inc.*, 400 F. Supp. 2d 1315, 1328 (N.D. Ga. 2005)); *Burnett v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004); *Bute v. Schuller Int'l, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned.")); *Welch v. Delta Air Lines*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) ("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims").

If a party raises an argument, it must also cite to evidence in the record, and the court need not independently consider evidence in the record. Fed. R. Civ. P. 56(c)(1), (3). The evidence provided must not consist of mere conclusions and unsupported statements. *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *see also Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000) (stating that a "bare and self-serving allegation where [the plaintiff] had no personal knowledge" was inadequate to carry the plaintiff's burden at summary judgment). Further, "[a] 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Garczynski v. Bradshaw*, 575 F.3d 1158, 1165 (11th Cir. 2009) (citations omitted).

### B. Title VII and *McDonnell Douglas*

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "In order to survive summary judgment in a discrimination action, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc).

A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *Id.* at 1220 & n.6 (quoting *Smith*, 644 F.3d at 1328). Where the plaintiff presents only circumstantial evidence at summary judgment, courts generally use the *McDonnell Douglas* framework to analyze discrete claims of disparate treatment. *Benjamin v. SNF Holding Co.*, 602 F. App'x 758, 562 (11th Cir. 2015). However, "the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Because the *McDonnell Douglas* elements are "flexible and depend on the particular situation," a plaintiff may survive summary judgment if the evidence presents a "convincing mosaic" of intentional discrimination. *Id.* (citing, in

17

relevant part, *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)).

Under the *McDonnell Douglas* test, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21. If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). If the defendant carries its burden, the plaintiff must demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Combs*, 106 F.3d at 1528. The defendant does not have to persuade the court at summary judgment that it was actually motivated by the proffered reasons; it only has to produce evidence to allow a factfinder to conclude that the employment decision was not motivated by discriminatory animus. *Id.* Although the defendant's burden is light, its reasons must

18

be "clearly and responsibly specific" so that "the plaintiff can be afforded a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 258.

## DISCUSSION

In the case at bar, Defendant does not contest that Plaintiff is a member of a protected class (African-American), that he was qualified to perform the job in question or that he suffered an adverse employment action (termination). Rather, Defendant argues that it is entitled to summary judgment because (1) Plaintiff has failed to present a similarly situated employee outside his protected class who was treated more favorable and therefore cannot establish a *prima facie* case of discrimination, and (2) he cannot show that the reasons Defendant provided for his termination are a pretext for discrimination. (Doc. 45 at 16, 20). The Court considers each argument in turn.

**1.     Plaintiff has established a *prima facia* case that Publix discriminated against him on the basis of race when he was terminated.**

In considering Plaintiff's racial discrimination claim under the fourth element of the *McDonnell Douglas* analysis, the plaintiff must provide the court with comparators outside of his protected class, defined as employees that are similarly situated "in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1226 (11th Cir. 2019) (en banc) (rejecting the previously used "same or similar" and "nearly identical" standards). In *Lewis*, the Eleventh Circuit stated that a comparator

need not have the same job title or function. *Id.* at 1227. However, it laid out several likely circumstances that would suggest that the plaintiff and other employees are similarly situated: (1) whether the other employees engage in the same conduct or misconduct as the plaintiff, (2) whether they are each subject to the same employment policies, (3) whether they report to the same supervisor, or (4) whether they share similar education or disciplinary history. *Id.*

Defendant avers that Plaintiff has failed to offer any comparators who were "similarly situated in all material respects." (Doc. 45 at 16–19); *see also Lewis*, 918 F.3d at 1218. According to Defendant, Plaintiff vaguely claims that "numerous white drivers" were allowed to refuse runs and select their preferred routes based on their seniority, the available drive times, or DOT rules. (Doc. 45 at 17). This lack of specificity, Defendant argues, prevents Plaintiff from establishing that "non-minority employee[s] with whom he seeks comparison are similarly situated in all relevant respects." (Doc. 45 at 16); *Wright*, 217 F.3d App'x at 929. Defendant also submits that Plaintiff's attempt to offer three former co-workers (Matthew Davidson, Connie Garner, and Dick Reckon)[6] as comparators is futile because the record belies his claims that these drivers were similarly situated. (Doc. 45 at 17–18). For instance, Plaintiff claims Ms. Garner avoided assigned runs for stores that were located in

---

[6] Mr. Reckon's name has been misspelled throughout the depositions as "Rechin."

predominately African-American neighborhoods. (Edwards Dep., Doc. 64 at 87; PSMF, Doc. 57-2 at ¶ 46). However, Plaintiff failed to submit any admissible evidence establishing Ms. Garner actually refused to accept runs on this basis. He cannot establish when Ms. Garner allegedly refused the runs or who allowed her to circumvent the run-assignment protocol. Additionally, Mr. Harris testified that he was not aware of any occasion where Ms. Garner refused to accept an assigned run for this reason. (Harris Dep., Doc. 54 at 47).

Defendant also argues that the record fails to support Mr. Edwards's claim that Mr. Davidson was allowed to refuse assigned runs without suffering adverse consequences. (Doc. 59 at 2–3). When asked whether Mr. Davidson was allowed to select his runs, Mr. Porter stated: "I mean if he's given a choice, yes. Other than that, I'm not sure I know that he's been in an accident where he flipped a truck over and I don't know he's mentioned that he doesn't go in that area anymore. I don't know if that's true or not." (Porter Dep., Doc. 66 at 78; emphasis added).

Plaintiff also claims Mr. Reckon is an appropriate comparator because he routinely refused assigned runs and "got the runs where he want[ed] to go." (Edwards Dep., Doc. 64 at 82; 6–7; PSMF, Doc. 57-2 ¶ 44). Mr. Edwards relies on Mr. Porter's testimony to substantiate this allegation. According to Mr. Porter, Mr. Reckon was allowed to select his preferred runs without facing adverse disciplinary action:

Q.    (By Ms. Williams) Did you see situations where [Mr. Reckon] would refuse a second run?

A.    (By Mr. Porter) I've been in the [dispatch] window where he's told me he's not taking that run, that this is the run he wants and, you know, people have been in dispatch longer than I was at the time and would go ahead and give it to him.

Q.    So managers would tell you or dispatchers would tell you –

A.    Yes.

A.    - give him the runs he wants?

A.    Yes.

(Porter Dep., Doc. 66 at 72).

The undersigned agrees with the Defendant that Mr. Davidson and Ms. Garner are not adequate comparators; Plaintiff has not shown they actually refused to accept assigned runs or were otherwise similarly situated "in all material respects" to Mr. Edwards.[7] However, Plaintiff has established that Mr. Reckon is a similarly situated employee outside his protected class who received more favorable treatment. Like

---

[7] Plaintiff also identifies two additional drivers as potential comparators, David Bullard and Tom Huck. (Doc. 57-3 at 12, 17–18). However, neither of these drivers satisfy the standard adopted in *Lewis*, 918 F.3d at 1218, *supra*. Plaintiff has failed to produce evidence that either of these drivers refused to accept run assignments or avoided termination (or other adverse consequences) for engaging in conduct similar to that of Mr. Edwards.

Mr. Edwards, Mr. Reckon had been employed as a driver for Publix. He and Mr. Edwards were subject to the same run assignment policies and were required to accept the assignments as issued by the dispatchers. The modified policy did not permit dispatchers to take into account a driver's seniority or her run preferences when assigning second runs. (Doc. 54-1). Furthermore, drivers were not permitted to refuse runs. *Id.* Despite these policies, the evidence submitted by Plaintiff shows that Mr. Reckon was allowed to refuse an assigned run without facing adverse employment actions. (Porter Dep., Doc. 66 at 71–73). Plaintiff, on the other hand, was terminated when Defendant concluded that he refused to accept an assigned run. Thus, the Court finds Mr. Reckon is a proper comparator and that Mr. Edwards has established a *prima facia* case of race discrimination.

## 2.    Legitimate, Non-Discriminatory Reasons

Once a plaintiff establishes a *prima facie* case of discrimination, the defendant bears the burden of producing evidence showing that it had a legitimate, nondiscriminatory reason for its actions. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). The defendant does not have to persuade the court at summary judgment that it was actually motivated by the proffered reasons; it only has to produce evidence to allow a factfinder to conclude that the employment decision was not motivated by discriminatory animus. *Id.* Although the defendant's burden is light, its reasons must be "clearly and responsibly specific" so that "the

23

plaintiff can be afforded a full and fair opportunity to demonstrate pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

In the case at bar, the Defendant argues that it has presented a legitimate, non-discriminatory reason for Mr. Edwards's termination—his refusal to accept an assigned run on May 8, 2018. (Doc. 45 at 20). Pursuant to Publix's Rules of Unacceptable Conduct, an employee is not allowed to refuse to comply with the instructions of a supervisor. Mr. Williams explained that the newly modified run assignment policy did not permit drivers to select their second runs of the day. (Williams Dep., Doc. 55 at 60–64). His explanation of Publix's policy was confirmed by both Mr. Horn and Mr. Harris. (Horn Dep., Doc. 50 at 25–26; Harris Dep., Doc. 54 at 56–58). Mr. Williams's testimony revealed that Mr. Edwards was only fired because he refused to take an assigned run.

Further, Mr. Edwards does not deny that he was terminated for insubordination. Rather, he submits that Publix's explanation of his termination "is unworthy of credence" because he never refused to take the assigned run that led to his dismissal and that "black and white drivers in the Atlanta Dispatch Department are not treated the same by Publix and they are afraid to complain out of fear of targeting by management." (Doc. 57 at 13, 21).

This Court finds that the Defendant has produced sufficient evidence that it had a legitimate, nondiscriminatory reason for terminating Mr. Edwards. Three of

Mr. Edwards's supervisors testified that Mr. Edwards's termination was based on his refusal to accept a *run* assignment, not a disagreement related to a recommended route he should select. Even though Mr. Edwards argues that dispatchers often overlooked this provision of the modified run assignment policy, he does not contest the fact that his dismissal was based on his employer's determination that he refused to comply with his supervisor's order. Thus, the Defendant has satisfied its burden of proving a legitimate, nondiscriminatory reason for Plaintiff's termination.

**3.    Pretext**

Having articulated a non-discriminatory reason for terminating Plaintiff, the burden shifts back to Plaintiff to raise a genuine factual issue as to whether Publix's proffered reason is a pretext for discrimination. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997). Plaintiff may do so either directly–through evidence of a discriminatory motive–or indirectly "by showing that the employer's explanation is unworthy of credence."  *Burdine,* 450 U.S. at 256. "[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young v. Gen. Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988) (citation omitted).

To establish pretext, a plaintiff must specifically respond to the employer's explanation and produce sufficient evidence for a reasonable factfinder to

conclude that the employer's stated reason is pretextual. *See Comb*, 106 F.3d at 1529 (explaining that the plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged actions."). Plaintiff must also rebut all legitimate non-discriminatory reasons that the employer has proffered for an employment action. *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007). The plaintiff rebuts those reasons by "pointing to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered explanation." *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)). The plaintiff must then show, not only that the employer's proffered reason was false, but that discrimination was the real reason behind the employer's actions. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). In other words, the employee must meet an employer's nondiscriminatory reason for a decision head on and rebut it, not merely quarrel with the employer's decisions. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010). To defeat a motion for summary judgment, the nonmovant must raise "significant probative evidence" that would be sufficient for a jury to find for that party. *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997). Hence, when a plaintiff fails to set forth specific facts

supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment may be granted in favor of the moving party. *Celotex*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

In an attempt to cast Defendant's reason for terminating Defendant as merely a pretext to disguise racial discrimination, Plaintiff offers the following evidence: (1) Publix's decision to require its employees to attend diversity training (Doc. 57-3 at 24); (2) Mr. Edwards's claim that 73% of African-American truck drivers have resigned from Publix since his termination, *id.* at 13; (3) Mr. Edwards's claim that Mr. Williams was tasked with conducting Defendant's "dirty work," (Edwards Dep., Doc. 64 at 127); and (4) Mr. Edwards's claim that African-American employees were afraid to disclose acts of racial bias for fear of retaliation. (Doc. 57-3 at 24).

The fatal flaw in these assertions, as noted by the Defendant, lies in the fact that they are wholly unsupported by reliable, admissible evidence or are irrelevant to the pending claim of racial bias. *See* (Doc. 59 at 14–15). The fact Publix hosted a seminar addressing issues involving diversity does not prove that Publix's decision to fire Mr. Edwards was because he is African-American. The same holds true for his claims that a significant number of American-Americans have resigned from Publix since his termination, and that they believed they would face retribution if

they voiced concerns of racial discrimination. Plaintiff has failed to produce any evidence, outside his own self-serving hearsay, to corroborate this statistic or his former co-workers' alleged concerns. Moreover, even if Plaintiff had produced some independent evidence establishing the veracity of these allegations, they lack any relevance to his claim that he was terminated because of his race.

Likewise, any attempt to cast aspersions on Mr. Williams's motivation for dismissing Plaintiff does not successfully defend against Defendant's stated reason for his termination. During his deposition, Plaintiff admitted that he did not believe that he was assigned the disputed run on May 8 because of his race. (Edwards Dep., Doc. 64 at 120). He also stated that he did not believe that Mr. Williams or Mr. Harris wanted him to take that run because he is African-American. *Id*. Additionally, he could not identify any allegedly discriminatory actions by Mr. Williams's supervisors. *Id*. at 124–25. In fact, Mr. Edwards's own admission that African-American drivers are allowed to circumvent the run-assignment policy without facing termination cuts against any suggestion that Mr. Williams's decision to fire Mr. Edwards was based on his race. (Edwards Dep., Doc. 64 at 88–89). At most, Plaintiff has established that some dispatchers were willing to assign second runs that individual drivers preferred in violation of Publix's modified policy. But that conduct alone does not prove Defendant's suspicion that he was fired because he is African-American or that Publix disciplines African-American drivers more

28

severely than non-minorities who violate company policy. *See Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989) ("[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions."). "It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason . . . was pretextual." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008); *see also Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) (stating that while all "reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, . . . an inference based on speculation and conjecture is not reasonable").

Mr. Edwards had not shown "weaknesses, implausiblities, inconsistencies, incoherencies, or contradictions" in Publix's stated reason for discharging him—failure to comply with the instructions of a supervisor—sufficient to provide a legitimate basis for a reasonable factfinder to find that explanation unworthy of credence. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, No. 16-16850, 2020 WL 4342677, at *10 (11th Cir. July 29, 2020) (citing *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs*, 106 F.3d at 1538)). The foundation of Plaintiff's pretext argument is that he was a hard-working, dependable

employee who deserved the right to choose his preferred route, and that Defendant's arbitrary enforcement of its run-assignment policies led to his unlawful dismissal based on his race. But this Court does not sit as a "super-personnel department," it cannot substitute its business judgment for Publix's, as long as there is no evidence that Publix's judgment was based on discriminatory intent. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

Plaintiff's refusal to comply with his supervisor's order was a violation of Publix's Rules of Conduct. The fact that other drivers (regardless of race), were allowed to circumvent the run-assignment rules and that Publix's enforcement of its own policies was inconsistent, does not prove Mr. Edwards was terminated because of his race. Thus, Publix's decision to terminate Plaintiff was based on a legitimate, non-discriminatory reason that justified the adverse action. *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir. 1987) (stating that Title VII "does not enact a general civility code"); *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Put frankly, employers are free to fire their employees for a good reason, a bad reason, reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

30

For these reasons, Plaintiff has failed to prove the reason for his termination was pretextual. Thus, he is unable to rebut Defendant's proffered race-neutral reason (insubordination) for his dismissal.

## IV. CONCLUSION

Based on the cited authority, the submissions of the parties, the evidence presented, and for all the reasons stated, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment (Doc. 45) be **GRANTED**.

IT IS SO **ORDERED** and **RECOMMENDED** on this 31st day of July 2020.

REGINA D. CANNON
United States Magistrate Judge

31